Joseph R. SPAZIANO, Petitioner–
Appellant,

v.

Harry K. SINGLETARY, Secretary, Flori-
da Department of Corrections, Thomas
L. Barton, Superintendent, Florida State
Prison, Respondents–Appellees.

No. 93–2049.

United States Court of Appeals,
Eleventh Circuit.

Oct. 7, 1994.

Michael Mello, Vermont Law School, South Royalton, VT, Martin J. McClain, Chief Asst. Capital Collateral Representative, Office of Capital Collateral Representative, Tallahassee, FL, for appellant.

Margene A. Roper, Asst. Atty. Gen., Dept. of Legal Affairs, Daytona Beach, FL, Gail E. Anderson, Office of Capital Collateral Representative, Tallahassee, FL, for appellees.

Before TJOFLAT, Chief Judge, EDMONDSON and CARNES, Circuit Judges.

CARNES, Circuit Judge:

Joseph R. Spaziano appeals from the district court's denial of the 28 U.S.C. § 2254 petition involving his conviction and death sentence in Florida for the murder of Laura Harberts.

## I. PRIOR PROCEEDINGS

The long and tortuous procedural history of this case began nineteen years ago. Although the murder had occurred two years earlier, Spaziano was indicted for it in 1975. The next year he was tried, convicted, and sentenced to death in the Circuit Court of Seminole County, Florida. In his initial direct appeal, Spaziano raised six issues, none of which he is pursuing here. The Florida Supreme Court affirmed the murder conviction but remanded the case for further sentence proceedings before the trial judge. *Spaziano v. Florida*, 393 So.2d 1119 (Fla. 1981) (*Spaziano I*). Further sentence proceedings were required for two reasons. One is that the sentencing judge had considered confidential information and a presentence investigation report without first giving the defense an opportunity to respond to that information, an action which was contrary to *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). The second reason new sentence proceedings were re-

quired is that the sentencing judge had apparently considered as aggravating factors convictions for nonviolent offenses and charges for which there were no convictions, an action contrary to Florida law. *See Spaziano I* at 1123.

On remand, the trial judge corrected his prior errors and resentenced Spaziano to death. On direct appeal from that reimposition of the death sentence, Spaziano raised five new issues, all of which the Florida Supreme Court held to be without merit. *See Spaziano v. State*, 433 So.2d 508 (Fla. 1983) (*Spaziano II* ), *aff'd, Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). The United States Supreme Court granted certiorari to consider two issues: whether the trial court erred in refusing to give lesser included offense instructions because the statute of limitations had run on the lesser offenses; and whether the trial court's imposition of a death sentence after the jury had recommended life imprisonment violated the Eighth Amendment or the Double Jeopardy Clause. The Supreme Court answered those questions in the negative and affirmed Spaziano's conviction. *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). That affirmance ended Spaziano's direct appeal.

Spaziano then filed a series of four motions pursuant to Florida Rule of Criminal Procedure 3.850 and two petitions for a state writ of habeas corpus, all of which were unsuccessful. Those proceedings and the issues they involved are reflected in the following

decisions: *Spaziano v. State*, 489 So.2d 720 (Fla.), *cert. denied*, 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986) (*Spaziano III* ); *Spaziano v. State*, 545 So.2d 843 (Fla.1989) (*Spaziano IV* ); *Spaziano v. Dugger*, 557 So.2d 1372 (Fla.1990) (*Spaziano V* ); *Spaziano v. State*, 570 So.2d 289 (Fla.1990) (*Spaziano VI* ); and *Spaziano v. Dugger*, 584 So.2d 1 (Fla.1991) (*Spaziano VII* ).[1] We will refer to and discuss the many issues and holdings of those various proceedings only as they relate to Spaziano's contentions before this Court.

■ After having spent fifteen years attacking his conviction and death sentence on direct appeal and in collateral proceedings in the state courts, Spaziano began federal habeas review proceedings. In November of 1991, he filed in the district court a multivolume, three-hundred-and-seventy-six page 28 U.S.C. § 2254 petition.[2] That petition raised twenty-three claims, all of which the district court eventually denied.[3] In his appeal from that denial, Spaziano has abandoned most of the claims he raised in the district court. We will address only those claims he has argued before us.

## II. DISCUSSION

### A. THE *HITCHCOCK* CLAIM

#### 1. The Claim Involving the Sentencing Judge

■ Spaziano claims that he was sentenced in violation of *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347

---

1. The *Spaziano V* opinion disposed of both the appeal from denial of Spaziano's third Rule 3.850 motion and his first petition for state habeas relief, which was filed directly with the Florida Supreme Court. However, that opinion itself does not explicitly refer to most of the eleven issues Spaziano raised in his first state habeas petition. The district court's order and opinion in the present proceeding does list all eleven of those issues and the Florida Supreme Court's implicit holding in rejecting each of them. *Spaziano v. Singletary*, No. 91–850–CIV–ORL–18 at 9–11 (M.D.Fla. Nov. 30, 1992).

2. Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts provides that a habeas petition "shall specify all the grounds for relief ... and shall set forth in summary form the facts supporting each of the

grounds thus specified." Because of its prolixity, the petition filed in this case does not comply with that rule, and the district court could have struck it pursuant to Rule 2(e) ("If a petition ... does not substantially comply with the requirements of rule 2 ..., it may be returned to the petitioner...."). Although the habeas rules require more than notice pleading, and some factual specificity will often be helpful, or even necessary, a habeas petition should not resemble a treatise. Effective writing is concise writing. Attorneys who cannot discipline themselves to write concisely are not effective advocates, and they do a disservice not only to the courts but also to their clients.

3. The twenty-three claims Spaziano raised in the district court are listed in Appendix A to this opinion.

(1987), which held the death sentence in another Florida capital case unconstitutional because the judge had instructed the advisory jury not to consider, and the judge had himself refused to consider, evidence of nonstatutory mitigating circumstances. Because the advisory jury in this case recommended a life sentence, whether it considered nonstatutory mitigating circumstance evidence is irrelevant to the *Hitchcock* issue. *See Bolender v. Singletary*, 16 F.3d 1547, 1562 n. 21 (11th Cir.1994) (any *Hitchcock* error in jury instructions "was rendered harmless in this case, however, when the advisory jury returned a recommendation of life imprisonment"); *see also Johnson v. Wainwright*, 806 F.2d 1479, 1482 n. 6 (11th Cir.1986) (sentence stage "jury charge error, if any, would be harmless beyond a reasonable doubt in light of the jury's life recommendation"), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987). The pertinent question is whether the trial judge, who made the decision to sentence Spaziano to death, thought that he could not consider nonstatutory mitigating circumstance evidence, or otherwise refused to do so, when he made the sentencing decision. While the issue of whether *Hitchcock* error occurred is a legal one, it is almost entirely dependent upon the answer to a question of fact: did the sentencing judge consider any and all nonstatutory mitigating circumstance evidence that was presented to him?

■ The district court found that at the time of the initial sentence proceeding the trial judge believed that the Florida sentencing statute, which explicitly limited the trial court's consideration of mitigating circumstances to those enumerated in the statute, precluded consideration of nonstatutory mitigating circumstances. However, the first death sentence imposed on Spaziano was vacated and the case remanded for resentencing. Spaziano was resentenced, and what matters is what the trial judge thought and did at that resentence proceeding, not at initial sentencing. The district court found that at the resentence proceeding, which occurred five years after the initial sentencing, the trial judge knew that he was bound to consider, and did actually consider, the nonstatutory mitigating circumstance evidence.

Because that is a finding of historical fact—what the judge knew and what he did—we review the finding under the deferential clearly erroneous standard, which the Supreme Court has defined as follows:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). In the present case, the district court did not hold an evidentiary hearing, but instead based its factfindings on the state record, documentary evidence, or inferences from other facts. However, the Supreme Court has held that the clearly erroneous standard, as defined in *Anderson*, is applicable to factfindings drawn solely from documents, records, or inferences from other facts. *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511–12. Therefore, it applies with full force here.

■ In determining what the sentencing judge believed about whether nonstatutory mitigating circumstances could and should be considered, there is good reason to distinguish, as the district court did, between the initial sentence proceedings and the resentence proceedings which occurred on remand. The initial sentence proceedings occurred in 1976, two years before the decision in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The resentence proceedings occurred in 1981, three years after *Lockett* had made clear what had not been clear under Florida law before: the Constitution requires that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at 2964–65 (footnote omitted).

Even though resentencing in this case occurred after *Lockett,* Spaziano argues that the trial judge was prevented by Florida law from expanding the resentence proceedings on remand to include anything beyond allowing Spaziano to respond to the presentence investigation report ("PSI") in order to cure the *Gardner* error. In support of that argument, Spaziano cites three Florida decisions that, in his words, "seemed to limit a *Gardner* remand hearing to rebutting the PSI": *Songer v. State,* 365 So.2d 696, 699–700 (Fla. 1978) (per curiam), *cert. denied,* 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979); *Dougan v. State,* 398 So.2d 439, 440 (Fla.), *cert. denied,* 454 U.S. 882, 102 S.Ct. 367, 70 L.Ed.2d 193 (1981); and, *Barclay v. State,* 411 So.2d 1310 (Fla.1982), *aff'd,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). Those decisions do not establish that Florida law prohibited consideration of nonstatutory mitigating circumstances in a post-*Lockett* resentence proceeding necessitated by *Gardner,* where the judge had felt precluded from considering such circumstances at the initial, pre-*Lockett* sentence proceeding, which is the situation we have here. *See Bolender v. Singletary,* 16 F.3d at 1563 (holding that the Florida Supreme Court's 1978 decision in *Songer* conformed state law to the requirements of *Lockett* ). In any event, any conflict between the dictates of the Constitution as interpreted in *Lockett* and state law regarding the scope of *Gardner* remand proceedings would be resolved in favor of the dictates of the Constitution as interpreted in *Lockett.* "Trial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990).

*Harvard v. State,* 486 So.2d 537 (Fla.), *cert. denied,* 479 U.S. 1001, 107 S.Ct. 614, 93 L.Ed.2d 611 (1986), involved resentencing of another capital defendant following a *Gardner* remand. Judge McGregor, who would later resentence Spaziano, was also the resentencing judge in the *Harvard* case. The Florida Supreme Court found in that case

that at the time Judge McGregor resentenced Harvard he had apparently felt himself limited to consideration of only the nonstatutory mitigating circumstance evidence presented in rebuttal to the PSI information. *See id.* at 538–59. However, the resentencing in the *Harvard* case took place in May of 1980; Spaziano was not resentenced until June of 1981. The issue before us is whether at the time he resentenced Spaziano on June 4, 1981, Judge McGregor considered the nonstatutory mitigating circumstance evidence presented to him, not what he did or thought when resentencing some other defendant thirteen months earlier. Being familiar with the record of both cases, the Florida Supreme Court distinguished what Judge McGregor did in *Harvard* from what he did in this case. *See Spaziano III* at 721 ("On the basis of this record, we distinguish this case from *Harvard v. State,* 486 So.2d 537 (Fla.1986), and find no violation of *Lockett.*" (Footnote omitted.)) The best evidence of whether Judge McGregor considered all the nonstatutory mitigating circumstance evidence when he resentenced Spaziano in this case is the record of the resentence proceedings in this case.

After the Florida Supreme Court remanded this case, and before the resentence hearing was held, Judge McGregor ordered a new, updated presentence investigation report. He did not rely on, or even consider, the old report. Before the actual resentence hearing was conducted on May 28, 1981, both sides filed a number of motions relating to the resentence hearing, and those motions were argued and decided at a May 21 motion hearing. The PSI was given to both sides at the beginning of that hearing.

In response to the prosecution's notification that it intended to offer new evidence in support of the prior violent felony conviction aggravating circumstance, the defense filed a motion in limine seeking to prevent the state from introducing any evidence at the resentence hearing. In that motion and at the May 21, 1981 motion hearing, the defense

argued that the sole purpose of the remand was to afford the defense an opportunity to rebut any information in the presentence investigation report. In arguing that motion, defense counsel cited some prior *Gardner* remand decisions of the Florida Supreme Court, including *Funchess v. State*, 399 So.2d 356 (Fla.), *cert. denied*, 454 U.S. 957, 102 S.Ct. 493, 70 L.Ed.2d 261 (1981). Judge McGregor pointed out to defense counsel that the *Funchess* opinion indicated that at the *Gardner* resentence proceedings in that case, the defense had been permitted to present new evidence in mitigation. He explained: "It seems like they do permit an expansion of the hearing, not just to rebut that which was contained in the PSI, properly contained, I should say .... [b]ut [also to] permit you to bring in an additional mitigating factor." Defense counsel responded that in presenting evidence in response to the PSI, it was proper to develop a new mitigating factor for the court to consider, but the state should not be allowed to introduce new evidence of an aggravating circumstance. The prosecutor stated: "our position, Your Honor, is this is not a narrow *Gardner* remand[,] that all the information that can be developed should be developed in the interest of judicial economy." Judge McGregor agreed with the prosecutor and denied the defense motion in limine to prevent the introduction of any new evidence supporting an aggravating circumstance.

The next matter taken up at the May 21, 1981, motion hearing was another motion in limine by the defense which sought to prevent the court from considering in support of an aggravating circumstance any previous conviction which had not been presented to the advisory jury. While arguing that motion, defense counsel stated: "In 1976, everyone was under the assumption that we were limited to statute, with respect to mitigation. Since that time, it's been found not to be the case. In fact, there are factors which should be considered." Neither the court nor the prosecutor took exception to that statement.

After disposing of the defense motions, Judge McGregor took up the prosecution's four motions, two of which are relevant to the present issue. The prosecutor had filed a motion to determine the nature of the proceedings, which he characterized as simply an attempt to get some guidance about how the sentence hearing would be conducted. In discussing that motion, Judge McGregor told defense counsel that introducing nonstatutory mitigating circumstances could open the door to rebuttal evidence from the prosecution. Defense counsel acknowledged that, but said the nonstatutory mitigating factor the defense intended to rely upon was residual doubt, which would not require the introduction of any evidence.

The motion hearing also involved another prosecution motion, which sought to compel the defense to provide a statement of particulars as to the nonstatutory mitigating circumstance factors it intended to rely upon at the resentence hearing. That written motion acknowledged that: "[C]ase law establishes ... [t]he Defendant is not limited in his mitigating factors to those specified by Statute." In discussing the motion, the prosecutor explained that it was filed, "[b]ecause there's a big word [world?] out there that the Defendant is entitled to avail himself of, especially after Lockett versus Ohio, which says, he's not bound by the ones that are listed by the legislature[,] so that we can be prepared." Defense counsel responded that the nonstatutory mitigating circumstances that they were contemplating relying upon were evidence of the defendant's good record in prison over the last five years, which would be proven by documents and testimony, and also the existence of residual doubt, which would be argued based on the trial record. In response to the state's continuing insistence that the defense provide further particulars about the nonstatutory mitigating circumstances it intended to rely upon, Judge McGregor expressed the opinion that under *Lockett* the defense was entitled to bring forth additional nonstatutory mitigating circumstances and told the prosecutor that, "I don't think, in view of *Lockett*, I can put a straightjacket on [defense counsel] here." The prosecutor explained that he was not trying to limit the defense but wanted notice

of what was going to be presented, to which Judge McGregor responded that the discussions that had occurred provided sufficient notice, and he refused to require the defense to file a written statement spelling out the nonstatutory mitigating circumstances it would rely upon.

At the actual resentence hearing, which was conducted on May 28, 1981, Judge McGregor made statements indicating that he understood that the defense was to be given an opportunity to rebut by evidence and argument matters contained in the PSI, and that "[t]he information by way of the defendant's background is whatever you may present to me or whatever I heard earlier plus what's contained in this PSI." The prosecutor presented new evidence in support of the prior violent felony conviction aggravating circumstance. The defense was given an opportunity to present evidence, but it presented none. Defense counsel argued as nonstatutory mitigating circumstances residual doubt and the fact that there was no evidence that Spaziano had misbehaved since he had been in prison.

On June 4, 1981, Judge McGregor issued his new sentence order. The order itself indicates that the purpose of the resentence hearing was to afford Spaziano an opportunity to present evidence in response to the PSI, and other evidence as well. The order states that the defendant was "offered the opportunity to present any evidence he might have and to respond to the PSI Report." The order goes on to say that the court had considered the new PSI report as well as the arguments of counsel, and that the court had weighed the aggravating and mitigating circumstances and found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances.

The resentence order in this case, like the order in *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), does not explicitly refer to nonstatutory mitigating circumstances. As the Court held in *Parker,* however, the failure to refer to nonstatutory mitigating circumstances does not indicate that evidence of them was not considered by the judge. The Court explained that under the Florida statute, "the sentencing judge is required to set forth explicitly his findings as to only the statutory aggravating and mitigating circumstances." *Id.* at 317, 111 S.Ct. at 737. "Florida case law at the time ... required no more." *Id.* In view of the absence of any state law requirement that sentencing orders contain specific findings as to nonstatutory mitigating circumstances, and the fact that nonstatutory circumstances are more difficult to organize into a coherent explanation, the Supreme Court held that it is enough for the sentence order to state that the court found "no mitigating circumstances that outweigh the aggravating circumstances." *Id.* at 318, 111 S.Ct. at 738 (internal quotation marks omitted) (emphasis deleted). That is materially identical to what the resentence order in this case does state: the court found "that sufficient aggravating circumstances exist to justify the death sentence and that the mitigating circumstances are insufficient to outweigh such aggravating circumstances ...."

The district court did not clearly err in finding that at Spaziano's resentence proceedings Judge McGregor knew he was bound to consider, and he did actually consider, all nonstatutory mitigating circumstance evidence presented to him. That factfinding is plausible in light of the record viewed in its entirety. At the least, it is one of two permissible views of the evidence, therefore, it cannot be clear error. The factual premise of Spaziano's *Hitchcock* claim involving the sentencing judge fails.

## 2. The Claim Involving Defense Counsel

█ Spaziano also argues that, irrespective of what the sentencing judge knew or considered, *Hitchcock* error occurred because defense counsel were unaware that they could present nonstatutory mitigating circumstance evidence at the resentence hearing. *See Bolender v. Singletary,* 16 F.3d at 1563. In the resentence proceedings, Spaziano was represented by attorneys Edward Kirkland and Jerry Schwarz. In support of the factual premise of this argument, Spaziano points to Kirkland's testimony in another

capital case. According to Spaziano's habeas petition, at an evidentiary hearing in another capital case, Kirkland testified that in 1976 he had thought that mitigating circumstances were limited in Florida to only those set out in the statute. Assuming that that averment in the petition is true, it does nothing to establish Spaziano's claim.

What either or both of his counsel thought in 1976, the year Spaziano was originally sentenced, and two years before the *Lockett* decision, is not the issue. The district court found that there was *Hitchcock* error at Spaziano's initial sentencing in 1976. That is not the question. The question is whether that error was cured by the post-*Lockett* resentence proceedings Spaziano was afforded in 1981. Spaziano has pointed to no testimony or statements of Kirkland that he was unaware of *Lockett* and its effect in 1981, when Spaziano was resentenced. In *Bolender v. Singletary*, 16 F.3d 1547, 1562–66 (11th Cir. 1994), we held that defense counsel at a Florida capital sentence proceeding conducted in 1980 was presumed to know that post-*Lockett* Florida law entitled the defense to present nonstatutory mitigating circumstance evidence; there is no reason not to apply that presumption to attorney Kirkland in regard to the 1981 resentence proceedings in this case.

As for co-counsel Schwarz, Spaziano has proffered an affidavit from him stating that at the 1981 resentence proceedings he labored under the belief that the defense was limited to presenting evidence in rebuttal of the PSI. Even if we accept the truth of that affidavit, however, it does nothing to establish that co-counsel Kirkland shared that belief. Kirkland did sign an affidavit about his representation of Spaziano in regard to sentencing. Conspicuously absent from that affidavit, however, is any indication that at the 1981 resentence proceeding Kirkland labored under the belief that Spaziano's right to present nonstatutory mitigating circumstances evidence was in any way restricted. In his affidavit, Kirkland explains that the reason he did not offer any mitigating circumstance evidence during the initial sentence proceed-

ings in 1976 is that Spaziano forbade it, fearing a loss of standing in the Outlaws motorcycle gang if anything was offered in mitigation, which Spaziano equated with begging for mercy. There is not one hint in Kirkland's affidavit that at the 1981 resentence proceeding he believed that Spaziano's right to present nonstatutory mitigating circumstance evidence was in any way restricted under the Florida law in existence then or by the trial judge's beliefs.

In any event, the record of the resentence proceedings belies the statement in Schwarz's affidavit that he thought the only nonstatutory mitigating circumstance evidence that he could present was that which rebutted something in the PSI. The record shows that when Spaziano was resentenced, both of his counsel knew that they could introduce into evidence and argue all nonstatutory mitigating circumstances applicable to the case. Both of them were aware of the 1978 *Lockett* decision, which clearly held that the Constitution required that defense counsel be permitted to offer any and all nonstatutory mitigating circumstance evidence. They were also told at the motions hearing, which preceded the resentence hearing by a week, that nonstatutory mitigating circumstance evidence could be introduced and argued. They were told that by the trial court, and even by the prosecutor. Defense counsel themselves must have known that they could present nonstatutory mitigating circumstance evidence, because at the motion hearing they indicated that that was what they intended to do. In response to the prosecutor's motion seeking to require defense counsel to specify nonstatutory mitigating circumstances, Schwarz himself said they intended to introduce evidence of Spaziano's good behavior in prison, a classic nonstatutory mitigating circumstance, and he also said that they would argue residual doubt as another nonstatutory mitigating circumstance.

The record shows that defense counsel pursued a dual strategy during the resentence proceedings. In an effort to thwart the prosecutor's attempt to introduce new evidence of an aggravating circumstance, counsel argued that the case had been re-

manded for the limited purpose of curing the *Gardner* error and that the only evidence that could be introduced was evidence to rebut anything in the PSI that was unfavorable to Spaziano. However, when that attempt failed and the court ruled that it was going to open the hearing up to new evidence from the prosecutor, defense counsel changed their tune and argued that the judge could and should consider new nonstatutory mitigating circumstance evidence, such as the evidence of a good prison record. The prosecutor and the trial court agreed.

We reject Spaziano's contention that defense counsel's presentation of nonstatutory mitigating circumstance evidence was hampered by their belief that the only such evidence they could introduce was that which rebutted something unfavorable in the PSI. Viewed against the record of the resentence proceedings, such a contention necessarily posits that defense counsel thought that residual doubt and a good prison record rebutted unfavorable information in the PSI, which in turn assumes that counsel knew at that time what was in the PSI. The record conclusively contradicts that essential assumption. The record shows with absolute clarity that at the time defense counsel stated that they intended to rely on those two factors as nonstatutory mitigating circumstances, they had not seen the PSI and did not know what was in it.[4] Therefore, they could not have thought that those two nonstatutory factors rebutted anything in the PSI.

Even if we ignore that irrefutable part of the record, however, Spaziano's argument still will not fly. In order to explain away defense counsel's assertion of residual doubt and a good prison record as rebuttal to information contained in the PSI, Spaziano posits a definition of rebuttal so broad that it swallows his contention whole. We have read the PSI, and if residual doubt and a good prison

record can be described as factors rebutting unfavorable matters in the PSI, any other nonstatutory mitigating circumstance Spaziano has belatedly proffered in this proceeding also would have fit within that description.

In summary, the district court did not err in rejecting this claim without an evidentiary hearing for two reasons. First, the record trumps the Schwarz affidavit and conclusively shows that this claim is without merit. *See Bolender,* 16 F.3d at 1565 n. 25 (rejecting affidavit contradicted by record). Second, even if we accept the statements in the affidavit at face value, the definition of rebuttal mitigation is so broad that no constitutional violation is established.

## B. THE *PARKER v. DUGGER* CLAIM

*Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), involved Eighth Amendment limitations upon the power of a state supreme court to uphold a death sentence after it determines that the sentencer should not have relied upon some of the aggravating circumstances the sentencer considered. The *Parker* trial judge overrode an advisory jury recommendation of life after he found six aggravating circumstances. The Florida Supreme Court determined that two of those aggravating circumstances should not have been considered because there was insufficient evidence to support them, but it nonetheless affirmed the death sentence based upon its own erroneous finding that the sentencing judge had not found any mitigating circumstances. *Id.* at 310–12, 111 S.Ct. at 734. The United States Supreme Court held that that action violated the Eighth Amendment. *Id.* at 319–23, 111 S.Ct. at 739–40.

The present case does not fit within the *Parker* rule. The sentencing judge in this case did not improperly consider any

---

4. Defense counsel never saw the first PSI, a fact underlying the *Gardner* error holding. On remand, the trial court decided to order an entirely new PSI, which was distributed at the beginning of the May 21, 1981, motion hearing. During that hearing, and *after* defense counsel had indicated they intended to present evidence of Spaziano's prison record and also argue residual doubt as nonstatutory mitigating circumstances, defense counsel said that they had *not* read the PSI, which they had just been given moments before.

aggravating circumstances. Both of the aggravating circumstances the judge considered in his sentencing decision were upheld by the Florida Supreme Court. *Spaziano II* at 510–11. Moreover, Spaziano states in his brief that, "[t]he Florida Supreme Court never concluded that there were *no* nonstatutory mitigating circumstances," but instead, "[i]t found the opposite." Nonetheless, Spaziano contends that *Parker* requires us to set aside his death sentence because the Florida Supreme Court failed, in his view, to explain adequately its decision to uphold the trial judge's override of the advisory jury recommendation. We do not mean to imply that the Constitution requires such an explanation, but we are satisfied the Florida Supreme Court did provide an adequate explanation for its decision:

> We find the facts suggesting that the death sentence be imposed over the jury's recommendation of life, *including the prior conviction of a violent felony which the jury did not have an opportunity to consider,* meets the clear and convincing test to allow override of the jury's recommendation in accordance with previous decisions of this Court. *Tedder v. State,* 322 So.2d 908 (Fla.1975).

*Spaziano II* at 511 (emphasis added). The square peg of this case will not fit into *Parker*'s round hole.

Although Spaziano has gone to great length to disguise his contention as a *Parker* claim, stripped to its essentials the claim is that the Florida Supreme Court erred in its application of the *Tedder* rule. *See Tedder v. State,* 322 So.2d 908 (Fla.1975). Our review of such a claim is quite circumscribed. We do not second-guess the Florida Supreme Court's application of its own decisional rules, and:

> It is not our function to decide whether we agree with the advisory jury or with the trial judge and the Supreme Court of Florida. Our review, rather, is limited to ascertaining whether the *result* of the override scheme is arbitrary or discriminatory.

*Lusk v. Dugger,* 890 F.2d 332, 342 (11th Cir.1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 805 (1990). *Accord, Francis v. Dugger,* 908 F.2d 696, 704 (11th Cir.1990), *cert. denied,* 500 U.S. 910, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991). The Supreme Court has already decided that issue and held that: "we see nothing irrational or arbitrary about the imposition of the death penalty in this case." *Spaziano v. Florida,* 468 U.S. at 467, 104 S.Ct. at 3166. That settles the matter. *See* 28 U.S.C. § 2244(c). The district court did not err in denying relief on this claim.

### C. THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM RELATING TO HYPNOSIS

Spaziano claims that his trial counsel, Edward Kirkland, rendered ineffective assistance of counsel in two respects related to the fact that the State's key witness, Tony Dilisio, had been hypnotized before trial. Spaziano contends that counsel, who knew that Dilisio had been hypnotized to help refresh his recollection, was ineffective for failing to object to Dilisio being allowed to testify at all, and that even if counsel could not have excluded Dilisio's testimony he was ineffective for failing to present and develop the hypnosis facts in order to impeach Dilisio before the jury.

██ Spaziano raised both of these ineffective assistance claims in a timely fashion in his first state collateral proceeding. The state trial court denied them on the merits, a decision affirmed by the Florida Supreme Court. *Spaziano III* at 721. The district court also denied relief on the merits. We agree with the decisions of the Florida courts and the district court that defense counsel did not render ineffective assistance of counsel in relation to the hypnosis matter.

When Spaziano was tried in 1976, no applicable state or federal precedent barred the use of hypnotically refreshed testimony. It was not until nearly a decade after the trial that the Florida Supreme Court held in *Bundy v. State,* 471 So.2d 9, 18 (Fla.1985), *cert. denied,* 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986), that hypnotically refreshed testimony is *per se* inadmissible.

The United States Supreme Court has still not reached that conclusion, and this Court has rejected it. In *Bundy v. Dugger,* 850 F.2d 1402, 1415 (11th Cir.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989), we explained that although the Supreme Court in *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), expressly did not address the issue, the reasoning of the *Rock* decision indicates that a *per se* ban on the admission of hypnotically refreshed testimony is not constitutionally required.

As the Florida Supreme Court noted, Spaziano's claim that his counsel was ineffective for failing to object to Dilisio's hypnotically refreshed testimony amounts to "claiming that his counsel was ineffective for failing to anticipate the [Florida Supreme Court's] *Bundy* decision." *Spaziano III* at 721. We have held many times that "[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop." *Elledge v. Dugger,* 823 F.2d 1439, 1443, *modified in unrelated part,* 833 F.2d 250 (11th Cir.1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988); *accord, Thompson v. Wainwright,* 787 F.2d 1447, 1459 n. 8 (11th Cir.1986), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987); *Funchess v. Wainwright,* 772 F.2d 683, 691 (11th Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986). In *Funchess,* for example, we rejected a claim that counsel's performance was deficient for failure to anticipate a Florida Supreme Court decision that came one year after trial. *See id.* Here, the unanticipated decision came nine years after trial. We need not address the prejudice component of this ineffective assistance claim, because the claim fails on the performance component.

Spaziano's other ineffective assistance claim relating to hypnosis involves a matter of trial strategy. It is undisputed that defense counsel discovered before trial that Dilisio had been hypnotized, and in a pretrial deposition of Dilisio, counsel developed facts relating to the hypnosis. It is also undisputed that counsel made a strategic decision to keep from the jury the fact of the hypnosis.

Indeed, counsel even objected, successfully, when the prosecutor attempted to bring out through Dilisio the fact that he had been hypnotized. Counsel decided to pursue the strategy he did because he had abundant information to use in impeaching Dilisio, and he did not want to risk having the jury think that Dilisio's testimony was more reliable because it had been hypnotically refreshed. Spaziano contends that that strategy was unreasonable because, in his view, it would have been better to use the fact that Dilisio had been hypnotized to impeach him even further than counsel did. We agree with the state courts and the district court that counsel's strategic decision to keep from the jury the evidence of hypnosis was not one of those relatively rare strategic decisions that is outside the wide range of reasonable professional assistance.

The Supreme Court has mandated a highly deferential review of counsel's conduct, especially where strategy is involved. *Strickland v. Washington,* 466 U.S. 668, 689–90, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984). Intensive scrutiny and second-guessing of attorney performance are not permitted. *Id.; accord, e.g., Atkins v. Singletary,* 965 F.2d 952, 958 (11th Cir.1992) ("Most important, we must avoid second-guessing counsel's performance."); *White v. Singletary,* 972 F.2d 1218, 1220 (11th Cir.1992) ("Courts also should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."). Because it is a "wide range" of performance that is constitutionally acceptable, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant,* 13 F.3d 384, 386 (11th Cir.1994). Cases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between. This case is not one of them.

In order to apply the standards laid down in Supreme Court and Eleventh Circuit precedent, we begin, as the Supreme Court has instructed us to, by "reconstruct[ing] the circumstances of counsel's challenged conduct, and [evaluating] the conduct from counsel's perspective at the time." *Strickland,* 466

U.S. at 689, 104 S.Ct. at 2065. In this case, counsel was confronted with the task of undermining Dilisio's credibility in order to convince the jury that his testimony was not reliable. Counsel developed abundant ammunition to use toward that end, and he effectively used it. As Spaziano concedes, trial counsel discredited Dilisio with his prior inconsistent statements, with his lapses of memory, with evidence that he had lied, and with evidence of his prior convictions. Counsel also brought out and stressed that Dilisio was an admitted drug user who sometimes hallucinated. From his pretrial discovery efforts, counsel knew that some of Dilisio's statements that were harmful to Spaziano had been made to law enforcement officers before Dilisio was hypnotized, but that others had not been. Counsel also knew that, as Spaziano concedes in his brief: "[t]here is a public misconception that hypnosis acts as a truth serum, preventing a hypnotized witness from lying." Based upon that knowledge and his extensive experience as a criminal defense attorney, counsel made the strategic decision to keep from the jury the fact that Dilisio had been hypnotized.

■ Spaziano's habeas petition and his briefs to this Court are filled with page after page of references to and quotations from letters, reports, and articles supporting his contention that the public perception is wrong, that hypnotically refreshed testimony can be and sometimes is less reliable than unrefreshed testimony. Cf. Rock, 483 U.S. at 59, 107 S.Ct. at 2713 ("The popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation and, in fact, hypnosis often has no effect at all on memory. The most common response to hypnosis, however, appears to be an increase in both correct and incorrect recollections." (Footnote omitted.)). The view of hypnosis espoused by Spaziano's present counsel may prove to be correct, but at the 1976 trial of this case defense counsel was dealing with the reality of a contrary public perception that Spaziano concedes still exists, and counsel was restrained by finite resources of time and money. The Constitution does not require defense counsel to pursue every possible line of defense until it withers away or bears fruit. As we held in

Gates v. Zant, 863 F.2d 1492, 1498 (11th Cir.), cert. denied, 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989):

Given the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense. A reasonably competent attorney often must rely on his own experience and judgment, without the benefit of a substantial investigation, when deciding whether or not to forego a particular line of defense.

The fact that a criminal defense attorney could have conducted a more thorough investigation that might have borne fruit does not establish that that attorney's performance was outside the wide range of reasonably effective assistance. See Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).

■ In judging the reasonableness of an attorney's investigation and of the strategic decisions that followed from that investigation, one factor to be considered is the experience of the attorney. We held in Gates, 863 F.2d at 1498, that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense without substantial investigation was reasonable under the circumstances." Spaziano's trial counsel, Edward Kirkland, had thirty years experience, during which he had handled more than 200 murder cases.

■ Another factor requiring deference to counsel's judgment call in this case is that it was a decision based upon his perception of how the jury would react to the evidence of hypnosis. We have held that a defense attorney's sense of the jury's reaction to testimony or evidence is a sound basis on which to make strategic decisions. See Card v. Dugger, 911 F.2d 1494, 1511 (11th Cir.1990); Foster v. Strickland, 707 F.2d 1339, 1344 (11th Cir.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); Gates, 863 F.2d at 1499.

There is further evidence in the record of the reasonableness of counsel's strategy. In anticipation of the withering cross-examina-

tion that Dilisio would be subject to because of his earlier lapses of memory and the inconsistencies between his trial testimony and his earliest statements to police, the prosecutor sought to elicit during direct examination of Dilisio the explanation that his recollection had been refreshed through hypnosis. Defense counsel objected and successfully kept that fact from the jury, thus cutting off the prosecutor's attempt to minimize the damage to Dilisio's credibility because of the memory lapses and inconsistent statements. Thus, the prosecutor shared defense counsel's evaluation of the probable impact the facts about hypnosis would have on the jury.

In order to prove that the strategy the defense counsel deliberately pursued in this case was outside the wide range of reasonable professional assistance, Spaziano must establish "that the approach taken by defense counsel would not have been used by professionally competent counsel." *Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989). At most, he has established that his present counsel would not have pursued the same strategy, a showing which misses the target by a wide mark. There is nothing in the record to indicate that Spaziano's present counsel are either more experienced or wiser than his trial counsel, but even if they were, the fact that they would have pursued a different strategy is not enough. As we held in *White v. Singletary*, 972 F.2d 1218 (11th Cir.1992), the question is not what the best lawyers would have done, nor even what most good lawyers would have done, but instead is only whether a competent attorney reasonably could have acted as this one did given the same circumstances. *Id.* at 1220–21. Because we answer that question in the affirmative, Spaziano has failed to establish the performance deficiency prong of this ineffective assistance claim, and we need not address the prejudice prong.

### D. THE SUBSTANTIVE HYPNOSIS CLAIM

In addition to the related ineffective assistance of counsel claim, Spaziano also claims that the use of Dilisio's hypnotically refreshed testimony violated the Eighth Amendment and the Due Process Clause. The district court denied this claim on the merits. The State argues that the claim is procedurally barred; that it is barred by the nonretroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and its progeny; and that the claim lacks merit. We need not address the procedural default issue or the merits, because we conclude that this claim is *Teague*-barred.

 Even though the State argued the *Teague* bar in its brief to this Court, Spaziano urges us not to address this defense because the State did not raise it in the district court. The Supreme Court has made it clear that even where the State does not argue the *Teague* bar at all, a federal court has discretion to decide whether the bar should be applied. *Caspari v. Bohlen*, —— U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994) ("Thus, a federal court may, but need not, decline to apply *Teague* if the State does not argue it."). It necessarily follows that we may address the issue when it is raised for the first time on appeal. Doing so where the *Teague* bar does apply is consistent with our well-established precedent that a district court's decision may be affirmed on grounds the district court did not address. *E.g., Powers v. United States*, 996 F.2d 1121, 1123–24 (11th Cir.1993) ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below."); *United States ex rel. Barbour v. District Director of INS*, 491 F.2d 573, 576 (5th Cir.) (affirming district court's denial of habeas corpus on different grounds), *cert. denied*, 419 U.S. 873, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). Moreover, deciding the issue will not cause delay or require further proceedings in the district court. No remand will be necessary, because the *Teague* issue is purely one of law and we would review the district court's decision of it *de novo* anyway. *See Macklin v. Singletary*, 24 F.3d 1307, 1312 (11th Cir.1994) ("with issues subject to *de novo* review on appeal, our scope of review is at its broadest and our willingness to decide without the benefit of a district court ruling should increase commen-

surately"). We therefore exercise our discretion to decide whether the hypnosis claim is *Teague*-barred.[5]

 The *Teague* doctrine bars retroactive application in a 28 U.S.C. § 2254 proceeding of any rule of law which had not been announced at the time the petitioner's conviction became final. The Supreme Court has directed that "a federal court should apply *Teague* by proceeding in three steps." *Caspari*, —— U.S. at ——, 114 S.Ct. at 953. The first step is to determine when the defendant's conviction and sentence became final. *Id.* Ordinarily, a conviction becomes final for these purposes "when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Id.* This case is unusual, because the Supreme Court granted certiorari to review the case · on direct appeal. The Court affirmed the conviction and sentence, issuing its opinion on July 2, 1984. That, then, is the date Spaziano's conviction and sentence became final, and the date after which any announced rule is "new" for purposes of his case.

The second step of the *Teague* analysis is determining whether the rule the habeas petitioner seeks or upon which he relies is a new one. *Caspari*, —— U.S. at ——, 114 S.Ct. at 953. A "new rule" is one that "imposes a new obligation on the States," or that produces a result "not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.; Gilmore v. Taylor*, —— U.S. ——, ——, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306 (1993); *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990); *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070. Even if the result the habeas petitioner seeks is within the "logical compass" of a prior Supreme Court decision, *Butler v. McKellar*, 494 U.S. 407, 415, 110

S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990); even if prior Supreme Court decisions "inform, or even control or govern, the analysis" of the claim, *Saffle v. Parks*, 494 U.S. 484, 491, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990); *Sawyer*, 497 U.S. at 236, 110 S.Ct. at 2828; *Butler*, 494 U.S. at 415, 110 S.Ct. at 1217; it is still a "new rule" claim unless the rule is actually dictated by pre-existing precedent.

Spaziano has not cited any controlling precedent, and we have found none, in existence on July 2, 1984, that dictated the exclusion of hypnotically refreshed testimony either in general or in the particular circumstances of this case. Indeed, even three years after that date, in the Supreme Court's view, the state of the law involving the appropriate role of hypnosis was still "unsettled." *Rock*, 483 U.S. at 59, 107 S.Ct. at 2713. Thus, the rule Spaziano seeks is a new rule barred from retroactive application to this case, unless one of the two *Teague* exceptions is applicable.

The third step in the *Teague* analysis is determining whether either of the two exceptions is applicable. *Caspari*, —— U.S. at ——, 114 S.Ct. at 953. The first exception, which is limited to rules that place conduct beyond the reach of criminal law, *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073, or remove a class of defendants from a certain type of punishment, *Sawyer*, 497 U.S. at 241, 110 S.Ct. at 2831, is obviously not applicable.

 The second *Teague* exception involves new " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Caspari*, —— U.S. at ——, 114 S.Ct. at 956 (quoting *Saffle*, 494 U.S. at 495, 110 S.Ct. at 1264). This exception is a narrow one, and its narrowness is consistent with the recognition underlying *Teague* that retroactivity "seriously undermines the principle of finality which is essential to the operation of our

---

**5.** We realize that in *Caspari* the Supreme Court said that, "if the State does argue that the defendant seeks a new rule of constitutional law, the court *must* apply *Teague* before considering the merits of the claim." —— U.S. at ——, 114 S.Ct. at 953. That language certainly could be read as requiring a federal appeals court to decide the *Teague* issue where the State raises it for the first

time on appeal, even though that is not what happened in *Caspari*. We need not decide in this case if the State's failure to raise the *Teague* bar issue in the district court gives us discretion to decline to decide it on appeal. Assuming that we do have discretion to decline to decide the *Teague* bar issue, we choose not to exercise that discretion.

criminal justice system." *Teague,* 489 U.S. at 309, 109 S.Ct. at 1074. To fit within the second exception, it is not enough that the rule "preserve the accuracy and fairness of capital sentencing judgments," *Sawyer,* 497 U.S. at 241, 110 S.Ct. at 2831, or that it "is aimed at improving the accuracy of trial." *Id.* The new rule also must be so fundamentally important that its announcement is a "groundbreaking occurrence." *Caspari,* —— U.S. at ——, 114 S.Ct. at 956. It must be a "watershed rule" that "alter[s] our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer,* 497 U.S. at 241, 110 S.Ct. at 2831 (internal quotation marks omitted). Thus, there is a requirement of "the primacy and centrality of the rule," *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264.

The Supreme Court has underscored the narrowness of this second exception by using as a prototype the rule of *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and by noting that "we believe it unlikely that many such components of basic due process have yet to emerge." *Teague,* 489 U.S. at 313, 109 S.Ct. at 1077; *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264; *Butler,* 494 U.S. at 415, 110 S.Ct. at 1218. The Court has further underscored the narrowness of the second *Teague* exception by its actions. Beginning with *Teague,* the Court has examined at least seven new rules of law against the second exception and found that none of them fit within its narrow confines. *See Teague,* 489 U.S. at 307, 109 S.Ct. at 1077; *Caspari,* —— U.S. at ——, 114 S.Ct. at 956; *Gilmore,* —— U.S. at ——, 113 S.Ct. at 2119; *Graham v. Collins,* —— U.S. ——, ——, 113 S.Ct. 892, 903, 122 L.Ed.2d 260 (1993); *Sawyer,* 497 U.S. at 242, 110 S.Ct. at 2831; *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264; *Butler,* 494 U.S. at 416, 110 S.Ct. at 1218.

■ A rule barring or curtailing the use of hypnotically refreshed testimony does not fit within this second *Teague* exception. Even assuming, as Spaziano contends, that such a rule would improve accuracy and increase fairness, it fails on the second component of the test. It would not be a "watershed rule" altering our understanding of the "bedrock procedural elements" absolutely essential to a fair trial. In other words, it would lack "the primacy and centrality" of the *Gideon* prototype. In *Saffle v. Parks,* 494 U.S. at 495, 110 S.Ct. at 1264, the Supreme Court said that: "[w]hatever one may think of the importance of respondent's proposed rule, it has none of the primacy and centrality of the rule adopted in *Gideon* or other rules which may be thought to be within the exception." The same is true here.

■ Spaziano nonetheless argues that the test for the second *Teague* exception should be whether the new rule increases fairness and improves the accuracy of the factfinding process. In rejecting precisely the same argument in *Sawyer v. Smith,* the Supreme Court explained:

this test looks only to half of our definition of the second exception. Acceptance of petitioner's argument would return the second exception to the broad definition that Justice Harlan first proposed in *Desist,* but later abandoned in *Mackey,* under which new rules that "significantly improve the pre-existing fact-finding procedures are to be retroactively applied on habeas." *Desist v. United States,* 394 U.S. 244, 262, 89 S.Ct. 1030, 1041, 22 L.Ed.2d 248 (1969). In *Teague,* we modified Justice Harlan's test to combine the accuracy element of the *Desist* test with the *Mackey* limitation of the exception to watershed rules of fundamental fairness. It is thus not enough under *Teague* to say that a new rule is aimed at improving the accuracy of trial. More is required. A rule that qualifies under this exception must not only improve accuracy, but also "alter our understanding of the *bedrock procedural elements* " essential to the fairness of a proceeding. *Teague,* 489 U.S., at 311, 109 S.Ct., at 1076 (quoting *Mackey* [*v. United States* ], 401 U.S. [667] at 693, 91 S.Ct. [1160] at 1180 [28 L.Ed.2d 404 (1971) ] ).

497 U.S. at 242, 110 S.Ct. at 2831. The Court reiterated that, "it is 'unlikely that many such components of basic due process have yet to emerge.' " *Id.* at 243, 110 S.Ct. at 2832 (quoting *Teague,* 489 U.S. at 313, 109 S.Ct. at 1077). None has emerged in this case.

As a final argument on this issue, Spaziano invites us to modify the *Teague* doctrine by incorporating into it the actual innocence exception from procedural default and abuse of the writ law. Putting aside the question of whether such an exception would have any relevance to this case, we cannot accept the invitation to "improve" the Supreme Court's handiwork. We lack the power to modify Supreme Court decisions; our duty is to follow them. Following *Teague* and its progeny, we affirm the district court's denial of relief on the substantive hypnosis claim.

## E. THE *BRADY v. MARYLAND* CLAIM

In Spaziano's fourth state collateral proceeding, he raised for the first time a *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claim. The Florida Supreme Court held the claim was procedurally barred and, in the alternative, lacked merit. *Spaziano VI* at 290–91. The district court affirmed on both grounds.

As to the procedural default of this claim, the district court held that Spaziano had not made the cause and prejudice showing necessary to lift the procedural bar, but the court did not explicitly address the actual innocence exception. The precise contours of that exception as it applies to guilt stage claims is unsettled at the present time. *See Roberts v. Singletary,* 29 F.3d 1474, 1480 (11th Cir.1994); *Alderman v. Zant,* 22 F.3d 1541, 1553 (11th Cir.1994). When the legal dust settles in this area, which could happen after the Supreme Court issues its decision in *Schlup v. Delo,* 11 F.3d 738 (8th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 1368, 128 L.Ed.2d 45 (March 28, 1994), it may be that the actual innocence exception will overlap substantially with the materiality component of a *Brady* claim. We need not speculate about that, however, because Spaziano's *Brady* claim lacks merit.

Spaziano's *Brady* claim consists of four subclaims. The one upon which he primarily relies involves three investigative reports which relate in one way or the other to a "Joe" having called the victim the night she disappeared. The Florida Supreme Court found from the record that: "defense counsel knew about Joe Suarez, knew that he had dated the victim, knew that he had previously

faced criminal charges for exposing himself to several women, and knew that he could have been the 'Joe' who telephoned the victim the night before the murder." *Spaziano VI* at 291. In short, defense counsel knew virtually as much about that subject as the prosecution did. The investigative reports in question do not establish that it was Joe Suarez who made the phone call to the victim the night before she disappeared. In any event, the reports are not admissible evidence, and even if Spaziano had had them before trial he could not have produced a witness to testify that Suarez had made the phone call. The reports are, to a considerable extent, inferences of an investigator which would not have been admissible. Spaziano concedes that at the time of trial Suarez was nowhere to be found.

Even where there is suppression, a new trial is required only where the suppressed evidence is material, and "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *accord, e.g., Aldridge v. Dugger,* 925 F.2d 1320, 1325, 1326 (11th Cir.1991); *Delap v. Dugger,* 890 F.2d 285, 298–99 (11th Cir.1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990). A reasonable probability of a different result is possible only if the suppressed information is itself admissible evidence or would have led to admissible evidence. Otherwise, the suppression of the information could not have affected the basis of the verdict, which is the evidence the factfinder heard. *Delap v. Dugger,* 890 F.2d at 299 (suppressed evidence not material where it is highly questionable that it would have been admissible under state law). The result of Spaziano's trial and sentencing would not have been different, because the information in question is not admissible evidence, and it would not have led to any admissible evidence.

## F. THE ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING CIRCUMSTANCE ISSUE

One of the two aggravating circumstances upon which Spaziano's death sen-

tence is based is the "especially heinous, atrocious or cruel" factor. The constitutionality of that factor was upheld in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), based upon the Supreme Court's understanding that the Florida courts would apply the construction announced in *State v. Dixon*, 283 So.2d 1 (Fla. 1973), *cert. denied*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), which limited the factor so that it applied only to a "conscienceless or pitiless crime which is unnecessarily torturous to the victim," 428 U.S. at 255–56, 96 S.Ct. at 2968 (quoting *State v. Dixon*, 283 So.2d at 9). Unless suitably limited, application of this aggravating circumstance can be unconstitutional. *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361–65, 108 S.Ct. 1853, 1857–59, 100 L.Ed.2d 372 (1988). The issue usually arises in the context of jury instructions; however, the jury in this case recommended a life sentence, which takes the propriety of the instructions it received out of issue. *See Bolender v. Singletary*, 16 F.3d 1547, 1562 n. 21 (11th Cir.1994); *Johnson v. Wainwright*, 806 F.2d 1479, 1482 n. 6 (11th Cir.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987). Focusing instead on what happened later in the sentencing process, Spaziano argues that his sentence is flawed because, he contends, neither the trial court nor the Florida Supreme Court applied the limiting construction from *Dixon* which was approved in *Proffitt.* We reject Spaziano's argument, as did the district court, because the trial court's resentence order and the Florida Supreme Court's opinion affirming it make it clear that both courts applied *Dixon*'s limiting construction.

In the resentence order the trial court entered the following factfindings and legal conclusions:

In respect to whether the capital felony committed in this case was committed in such a manner as to bring it within the category of being "especially heinous, atrocious, or cruel", it appears to this Court and this Court so finds that the circumstances of this homicide fit within the definitions of each of those terms. The record reflects that the Defendant told one of the State's witnesses that he had cut and re-

moved the breasts of the victim while she was still living. In addition, the Defendant told the witness for the State that he had "cut the cunt out" of his victim while she was still living. The pain suffered by the victim prior to death must have been unspeakable. The mental agony that she suffered knowing for certain that she would be always less than a whole woman and probably knowing for certain that her death was imminent, must have been beyond comprehension. Such acts of the Defendant were atrocious which set this capital felony apart from the "norm" of capital felonies. Such actions were especially cruel as one cannot think of greater cruelty to be committed upon a woman. The word heinous being defined as "shockingly evil" is an especially appropriate characterization of the conduct of the Defendant. It might be possible that, absent medical examiner verification of such butchering (the victims body was found 24 months after her death and in an advanced state of deterioration) one should not put too great a reliance upon what the Defendant may have stated in braggadocio fashion to his young companion. However, all of the evidence before the Court confirms that the Defendant was speaking factually. The youthful companion testified that he observed the body of the victim shortly after her death and found it to be "blood spattered". The stabbing of the victim in the Orange County case indicated that the Defendant's use of a knife to inflict torturous cuts upon his victims was his modus operandi. The Defendant when asked by a friend as to why he did it that way stated, "man that's my style". This crime appears to this Court to be a *"conscienceless or pitiless crime which is unnecessarily torturous to the victim"*.

(Emphasis added.) The underscored finding is the *Dixon* standard itself. *Proffitt* requires no more, even though the trial court did go further.

When the Florida Supreme Court reviewed the application of this aggravating circumstance and affirmed the death sentence, it also applied the very language from

*Dixon* that had been upheld in the *Proffitt* decision:

> We also conclude that the other aggravating circumstance, that the murder was heinous, atrocious, and cruel, was properly determined by the trial judge to be applicable to this case. One of the individuals who accompanied the appellant to the dump site to view the two corpses testified that the bodies were covered with "quite a bit" of blood and he could see cuts on the breasts, stomach, and chest. The witness further testified that appellant told him of how he tortured the victim with his knife while she was still living. This testimony of appellant's treatment of his victim clearly places his acts within the category of *"conscienceless or pitiless crime which is unnecessarily torturous to the victim"* so as to set this "crime apart from the norm of capital felonies." *State v. Dixon,* 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).

*Spaziano II* at 510 (emphasis added). Spaziano's claim, which is premised on the contention that the *Dixon* standard was not applied, is without merit.[6]

### III. CONCLUSION

The district court's judgment denying the 28 U.S.C. § 2254 petition is affirmed.

### APPENDIX A

### LIST OF CLAIMS SPAZIANO RAISED IN THE DISTRICT COURT

1) Denial of right to present and have considered mitigating circumstance evidence in violation of *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987);

2) Ineffective assistance of counsel at the resentencing proceedings based on counsel's failure to investigate and present nonstatutory mitigating circumstance evidence;

3) Failure of the Florida courts to credit mitigating circumstance evidence in considering the validity of the jury override,

in violation of *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1989);

4) Failure of the Florida courts to consider and weigh as a mitigating circumstance the evidence of Spaziano's organic brain damage;

5) Ineffective assistance of counsel at the guilt stage based on counsel's failure to have the testimony of the state's key witness excluded on grounds that he had been hypnotized and counsel's failure to inform the jury of that fact;

6) The State's use of testimony from a witness who had been hypnotized;

7) Insufficiency of the evidence to prove guilt beyond a reasonable doubt;

8) Violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972);

9) Unconstitutionality of the "especially heinous, atrocious or cruel" aggravating circumstance both on its face and as applied;

10) Use of an aggravating circumstance not established beyond a reasonable doubt;

11) Incompetency to stand trial at the time of trial and sentencing;

12) Ineffective assistance of counsel based on counsel's failure to petition the court for a competency evaluation and hearing;

13) Improper prosecutorial argument at the sentencing stage;

14) Improper limitation on the cross-examination of a prosecution witness;

15) Jury instruction that it was the juror's "function" to "agree upon a verdict;"

16) Trial court's consideration in sentencing of aggravating circumstance factors not presented to the advisory jury whose recommendation the court overrode;

17) Ineffective assistance of counsel on direct appeal;

---

**6.** We also hold, for the reasons set out in the district court's opinion, that Spaziano's mental incompetency claim and the ineffective assistance claim related to it are without merit.

18) Unconstitutionality of the Florida Supreme Court's application of its jury override standards;

19) The trial court and the Florida Supreme Court's improper evaluation of the reasonableness of the advisory jury recommendation based on those courts' belief that a jury recommendation of life was proper only if the mitigating circumstances outweighed the aggravating circumstances;

20) Failure to reassign the sentence proceedings on remand to a new judge;

21) Permitting the state to introduce new aggravating circumstance evidence at resentencing;

22) Trial court's refusal to credit residual doubt as a mitigating circumstance;

23) Cumulative error at the trial and sentence proceedings.